UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| RUBEN GARCIA, derivatively for the benefit of and on behalf of the Nominal Defendant POPULAR INC., <br><br> Plaintiff, <br><br> vs. <br><br> RICHARD L. CARRIÓN, DAVID H. CHAFEY, JORGE A. JUNQUERA, MANUEL MORALES, FRANCISCO M. REXACH, JUAN J. BERMÚDEZ, MARIA L. FERRÉ, WILLIAM J. TEUBER, JOSE R. VIZCARRONDO, and MICHAEL J. MASIN, <br><br> Defendants, <br><br> and <br><br> POPULAR, INC., a Puerto Rico Corporation, <br><br> Nominal Defendant. | CIVIL ACTION NO. 3:09-CV-1507 <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, AND ABUSE OF CONTROL**

Plaintiff, for his Verified Derivative Complaint, by his undersigned attorneys, alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.      Plaintiff Ruben Garcia, by his undersigned attorneys, submits this Verified Derivative Complaint. This is a shareholders' derivative action brought in the name of and for the benefit of nominal defendant Popular, Inc. ("Popular" or the "Company") against certain current and former executive officers and members of the Board of Directors of Popular (the "Individual Defendants"). The action arises from these Individual Defendants' breaches of fiduciary duties, waste of Popular's corporate assets, and abuse of their control of Popular in connection with their causing, approving, and/or acquiescing in Popular's issuance of false and misleading financial reports and financial statements filed with the Securities and Exchange Commission ("SEC"), conducting a $400 million preferred stock offering based on a false and misleading prospectus filed with the SEC, and generally exposing Popular to hundreds of millions of dollars in liability to purchasers of its common stock in violation of the federal securities laws.

2.      Beginning at least as early as January 23, 2008, and continuing through the present (the "relevant period"), the Individual Defendants, in breach of their fiduciary duties to Popular and its investors, devised, approved and implemented a plan to unlawfully conceal that: (i) the Company's deferred tax assets related to its U.S. operations were materially overstated; (ii) the Company was experiencing increasing loan losses in Puerto Rico and the U.S. construction sectors; (iii) the quality of the Company's remaining mortgage-related loans in its U.S. mainland portfolios and other assets were deteriorating and were materially overstated; (iv) the Company was experiencing a higher percentage of non-performing loans; (v) the Company's new loan originations were declining; and (vi) as a result of the foregoing, the Company would soon be facing liquidity concerns and would be forced to drastically cut or eliminate paying a dividend to shareholders.

3.      Due to red flags the Individual Defendants became aware of by mid-2006 at the latest, the Company's senior executives and directors were under a continuing obligation to investigate and require accurate disclosure of the value of Popular's assets and the effects any asset impairments or

write-downs on non-performing loans would have on the Company's reported financial results. This duty was heightened by the decision of the Popular Board to cause the Company to conduct a $400 million preferred stock offering in a falling real estate market. However, Popular's senior executives refused to take the necessary impairment charges and write-downs or to increase Popular's loan loss reserves in order to continue reporting that the Company was succeeding under their direction. For their part, the outside directors on the Popular Board participated in the issuance of the false registration statement used to conduct the $400 million preferred stock offering and improvidently and improperly deferred to the Company's senior executives to whom a majority of them are beholden by virtue of personal, professional and financial relationships.

4.      After nearly a year of concealing material facts, including the extent to which the Company's assets were impaired, its loans were not performing and its loan loss reserves were understated, on January 22, 2009, Popular announced its financial results for the fourth quarter and year end of 2008, the period ended December 31, 2008. For the quarter, the Company reported a net loss of $702.9 million, citing to a higher provision for loan losses, among other things.

5.      As a result of the Individual Defendants' false statements to the investing public, Popular's stock traded at inflated levels during the relevant period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, and half of Popular's market capitalization simply vanished.

6.      Due to the Individual Defendants' failure to timely disclose these material facts, an investor has sued the Company in a securities class action lawsuit, in which Individual Defendants Richard Carrión ("Carrión") and Jorge A. Junquera ("Junquera") are named defendants. The class action lawsuit alleges various violations of federal securities laws. Because of the Individual Defendants' misconduct, Popular and the Individual Defendants themselves face the substantial likelihood of significant civil liability, hundreds of millions of dollars in potential fines and penalties, and Popular will potentially be forced to expend hundreds of millions of dollars to investigate these claims, defend itself and satisfy adverse judgments or settlements. Moreover, as a direct and proximate result of the Individual Defendants' misconduct, Popular's once valuable

- 2 -

banking enterprise and reputation has been irreparably tarnished. Furthermore, the Individual Defendants' malfeasance has caused, and will continue to cause, Popular and its shareholders great harm, by having the Company absorb the financial losses as the common stock price falls from its artificially inflated prices during the relevant period to a price considerably lowered because of a "liars' discount" and a skepticism of its financial disclosures by investors. Finally, as a result of these disclosures, Popular has been forced to dramatically slash its dividend, to accept funds from the government's bank bailout program (restricting its ability to pay dividends and issue stock and otherwise damaging its credit ratings), its credit ratings have been slashed (potentially increasing its future costs of borrowing) and the Company now faces having to sell performing assets.

7.      The Individual Defendants each owed and failed to carry out their fiduciary obligations to the Company and its shareholders. This shareholder derivative action is on behalf of Popular and seeks to recover damages caused to the Company by its directors, CEO and senior officers who breached their fiduciary obligations to the Company. Because of the gross dereliction of duty alleged, the fact that the entire Popular Board knowingly, intentionally and/or recklessly endangered Popular by causing it to conduct the $400 million registered preferred stock offering, and the fact that a majority of the members of Popular's Board of Directors are not independent or disinterested, demand on the Popular Board would be futile and has not been made.

**JURISDICTION**

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      Venue is proper in this Court because one or more of the Defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Popular occurred in this

District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

10.    Plaintiff Ruben Garcia, is and was a shareholder of nominal defendant Popular at relevant times.  Plaintiff is a resident and citizen of the State of Florida.

**Nominal Defendant**

11.    Nominal Defendant Popular, Inc. ("Popular" or the "Company") is a Puerto Rico corporation headquartered in San Juan, Puerto Rico.  Popular is a publicly owned bank holding company registered under the Bank Holding Company Act of 1956, as amended and, accordingly, subject to the supervision and regulation of the Board of Governors of the Federal Reserve System. Popular was incorporated in 1984 under the laws of the Commonwealth of Puerto Rico and is the largest financial institution based in Puerto Rico, with consolidated assets of $38.9 billion, total deposits of $27.6 billion and stockholders' equity of $3.3 billion at December 31, 2008.  As of December 31, 2008, Popular ranked 29th among bank holding companies based on total assets according to the Federal Reserve System.  Popular operates in three target markets: Puerto Rico, the mainland United States, and processing and other technology services in Puerto Rico, Venezuela, Florida and the Dominican Republic.  The Company offers retail and commercial banking services in Puerto Rico, through its principal bank subsidiary, Banco Popular de Puerto Rico ("Banco Popular" or the "Bank").  The Bank accounted for 66% of the total consolidated assets of the Company at December 31, 2008.  Banco Popular has the retail franchise in Puerto Rico, with 179 branches and over 600 automated teller machines (ATMs).  The Bank also operates seven branches in the United States Virgin Islands, one branch in the British Virgin Islands and one branch in New York. Banco Popular has two subsidiaries: Popular Auto, Inc., a vehicle financing, leasing and daily rental company, and Popular Mortgage, Inc., a mortgage loan company with 32 offices in Puerto Rico.  The Company has over 282 million shares of common stock issued and outstanding which trade on the Nasdaq under the ticker symbol "BPOP."

**The Individual Defendants**

12.     Defendant Richard Carrión ("Carrión"), a resident and citizen of Puerto Rico, has been Chairman of the Board of Popular since 1993, CEO of Popular since 1994, formerly served as President of Popular from 1991 to January 2009, and has served as Chairman of the Bank since 1993, as CEO of the Bank since 1989, and formerly served as President of the Bank from 1985 to 2004.  Carrión also serves as Chairman and CEO of Popular North America, Inc. and other direct and indirect wholly-owned subsidiaries of the Company.  Carrión has served as a Director of the Federal Reserve Bank of New York since January 2008.  Carrión has also served as Chairman of the Board of Trustees of Fundación Banco Popular, Inc. since 1982 and as Chairman and Director of Banco Popular Foundation, Inc. since 2005.  Carrión prepared, authorized and/or issued the false and misleading statements Popular made during the relevant period and signed false and misleading Sarbanes-Oxley certifications in connection with all of Popular's relevant period financial filings with the SEC.  Carrión received over $2 million in salary, bonus and incentive compensation from Popular in fiscal 2008.

13.     Defendant David H. Chafey ("Chafey"), a resident and citizen of Puerto Rico, has served as Popular's President and Chief Operating Officer since January 2009.  Chafey served as President of the Bank since 2004 and Supervisor of the Bank's Retail Banking Group from 1996 through 2004.  Chafey has also served as Senior Executive Vice President of Popular International Bank, Inc. since 1999 and Popular North America, Inc. since 2000, direct and indirect wholly-owned subsidiaries of Popular.

14.     Defendant Jorge A. Junquera ("Junquera"), a resident and citizen of Puerto Rico, has served as Popular's Senior Executive Vice President and Chief Financial Officer since 1997 and as a director of Popular since 1990.  Junquera also serves as Chief Financial Officer of the Bank and Supervisor of the Financial Management Group.  Previously, Junquera served as Supervisor of the Popular, Inc. U.S. Operations from January 1996 to December 2001, and has served as President and Director of Popular International Bank, Inc. and Popular North America, Inc. since January 1996, directly and indirectly wholly-owned subsidiaries of the Popular, Inc, respectively.  Junquera also

served as a Director of the Bank until April 2000 and from 2001 to present.  Junquera served as President of Banco Popular North America until December 2001, as President of Banco Popular, National Association, a Director of Popular Financial Holdings, Inc., Popular Cash Express, Inc., Popular FS, LLC, Popular Leasing USA, Inc. and of Banco Popular North America, indirectly wholly-owned subsidiaries of the Corporation and serves as a Director of Banco Hipotecario Dominicano and Consorcio de Tarjetas Dominicanas, S.A., where Popular has an indirect investment.  Junquera prepared, authorized and/or issued the false and misleading statements Popular made during the relevant period and signed false and misleading Sarbanes-Oxley certifications in connection with all of Popular's relevant period financial filings with the SEC. Junquera received over $800,000 in salary, bonus and incentive compensation from Popular in fiscal 2008.

15.     Defendant Manuel Morales ("Morales"), a resident and citizen of Puerto Rico, has served as a Director of Popular since 1990.

16.     Defendant Francisco M. Rexach ("Rexach"), a resident and citizen of Puerto Rico, has served as a Director of Popular since 1990.

17.     Defendant Juan J. Bermúdez ("Bermúdez"), a resident and citizen of Puerto Rico, has served as a Director of Popular since 1990 and has served as Chairman of the Trust Committee of the Bank since 1996.

18.     Defendant Maria L. Ferré ("Ferré"), a resident and citizen of Puerto Rico, has served as a Director of Popular since April 2004.

19.     Defendant William J. Teuber ("Teuber"), a resident and citizen of Massachusetts, has served as a Director of Popular since 2004.

20.     Defendant Jose R. Vizcarrondo ("Vizcarrondo"), a resident and citizen of Puerto Rico, has served as a Director of Popular since 2004 and as a member of the Trust Committee of the Bank since 2004.

21.     Defendant Michael J. Masin ("Masin"), a resident and citizen of New York, has served as a Director of Popular since January 2007.

- 6 -

22.     The defendants referenced above in ¶¶12-21 are referred to herein as the "Individual Defendants."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

23.     By reason of their positions as officers, directors and/or fiduciaries of Popular and because of their ability to control the business and corporate affairs of Popular, the Individual Defendants owed Popular and its shareholders fiduciary obligations of care, candor, compliance, fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage Popular in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Popular and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

24.     Each director and officer of the Company owes to Popular the fiduciary duty to comply with the laws of the United States and to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

25.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's finances and operations, and defendants also had an obligation not to entrench themselves as officers and/or directors of the Company, to allow open and honest board elections and to not advance their own personal, financial or economic interests over and at the expense of the Company's public shareholders.

26.     The Individual Defendants, because of their positions of control and authority as directors or officers of Popular, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Popular, each of the Individual Defendants had access to all non-public information about the financial condition, operations and future business prospects of Popular, including, without limitation, the illegal and improper activities which the Individual Defendants caused Popular to engage in.

- 7 -

27.     To discharge their duties, the officers and directors of Popular were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of Popular.  By virtue of such duties, the officers and directors of Popular were required to, among other things:

(a)     manage, conduct, supervise and direct the business and internal affairs of Popular in accordance with the laws and regulations of Puerto Rico, the United States, and pursuant to the charter and bylaws of Popular;

(b)     neither violate, nor knowingly permit any officer, director or employee of Popular to violate applicable laws, rules and regulations;

(c)     remain informed as to the status of Popular's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Popular and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that Popular's operations would comply with all laws, Popular's financial statements and information filed with U.S. financial regulators and disseminated to the investing public and to Popular shareholders in Annual Reports would be accurate and the actions of its directors would be in accordance with all applicable laws; and

(f)     exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of Popular by the officers and employees of Popular and any other reports or other information required by law from Popular and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial

affairs of Popular and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

28.     During all times relevant hereto, each of the Individual Defendants occupied positions with Popular or was associated with the Company in such a manner as to make him or her privy to confidential and proprietary information concerning Popular, its operations, finances and financial condition.  Because of these positions and such access, each of the Individual Defendants knew that the true relevant facts specified herein had not been disclosed to and were concealed from Popular's shareholders.   The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material information regarding Popular and to take any and all actions necessary to ensure that the officers and directors of Popular do not abuse their privileged positions of trust, loyalty and fidelity in a manner which causes the Company to violate the law.

## SUBSTANTIVE ALLEGATIONS

29.     Popular is the bank holding company for its operating subsidiary the Bank, the largest bank in Puerto Rico, with some 240 branches.   In addition to banking products, the Bank's subsidiaries offer vehicle financing and leasing (Popular Auto), small consumer loans (Popular Finance), insurance (Popular Insurance) and mortgages (Popular Mortgage).

30.     Beginning in January 2008 at the earliest, Popular's senior executives and directors began causing and/or allowing the Company to conceal that the Company's deferred tax assets related to its U.S. operations were materially overstated on its books, that the Company was experiencing increasing loan losses in Puerto Rico and the U.S. construction sectors, that the quality of the Company's remaining mortgage-related loans in its U.S. mainland portfolios and other assets was deteriorating and was materially overstated on Popular's books, that the Company was experiencing a higher percentage of non-performing loans than was being reported, that the Company's new loan originations were declining, and that as a result, the Company would soon be facing liquidity concerns and would be forced to dramatically cut or eliminate paying a dividend to shareholders and accept government bailout funds (affecting its ability to pay dividends, issue stock

and other factors affecting its credit ratings). As a result of these misstatements, purchasers of Popular's publicly-traded securities have filed a securities fraud class action against Popular and are alleging that the Company's stock price was artificially inflated between January 23, 2008 and January 22, 2009, potentially exposing Popular to hundreds of millions of dollars in civil liability under the Securities Exchange Act of 1934 (the "Exchange Act"). Popular also faces exposure to potential liability under the Securities Act of 1933 (the "Securities Act") for an offering conducted while the price of the Company's securities was allegedly inflated due to false and misleading statements to the market. Its dividend was slashed from $0.16 cents per share to $0.02 cents per share and Popular was forced to accept government bailout funds.

31.     Specifically, beginning on January 23, 2008 at the latest, the Individual Defendants caused and/or allowed Popular to issue a press release announcing that the Company had agreed to "sell certain assets of Equity One, the U.S. mainland consumer finance operations of Popular Financial Holdings, to American General Finance, Inc., a member of American International Group" for approximately $1.5 billion in cash. According to Moody's Investors Service, this transaction would "reduce Popular's exposure to US subprime mortgages and significantly strengthen its holding company liquidity position since Popular has largely financed its US consumer finance business with short- and medium-term wholesale borrowings at the parent company level."

32.     On January 24, 2008, the day after announcing the sale of its subprime assets to AIG, the Individual Defendants allowed and/or caused Popular to issue a press release announcing the Company's financial results for the fourth quarter and year end of 2007, the period ended December 31, 2007. For the quarter, the Company reported an estimated net loss of $294.1 million and an estimated basic and diluted net loss per common share of $1.06. In the Company's release issued that day, Individual Defendant Carrión conceded that "[t]hese are obviously disappointing results," but reassured investors that Popular "*continue[d] to take the difficult steps to improve our performance moving forward*." The Company's release also addressed the sale of Equity One, stating it had effectively reduced the Company's exposure in its risky mortgage and consumer loan portfolios:

- 10 -

In January 2007, Popular's management announced that based on a comprehensive strategic and financial assessment of all of PFH's operations, the Corporation decided to adopt a Restructuring and Integration Plan at PFH, the holding company of Equity One (the "PFH Restructuring Plan"). ***The PFH Restructuring Plan called for PFH to exit the wholesale subprime mortgage loan origination business***, to consolidate support functions with its sister U.S. banking entity, Banco Popular North America ("BPNA"), creating a single integrated North American financial services unit, ***and to focus on existing profitable businesses***. At that time, Popular decided to continue the operations of Equity One and its subsidiaries ("Equity One"), with over 130 consumer services branches principally dedicated to direct subprime loan ***origination***, consumer finance and mortgage servicing. ***However, given the unforeseen disruption in the capital markets since the summer of 2007 and its impact on funding, Popular's management now believes that it will be difficult to generate an adequate return on the capital invested at Equity One.***

As indicated in the press release dated January 23, 2008, Popular, Inc. announced the signing of an Asset Purchase Agreement (the "Agreement") to sell certain assets of Equity One, the U.S. mainland ***consumer*** finance operations of Popular Financial Holdings, to American General Finance, Inc., a member of American International Group. ***The Agreement contemplates the sale of a significant portion of Equity One's mortgage loan and consumer loan portfolio approximating $1.5 billion….***

[Emphasis added.]

33.     In January 2008, the Board's Compensation Committee also approved significant salary increases for most of Popular's senior executives, including raising Junquera's salary to $565,950 per year and raising Chafey's salary to $767,250 per year. Moreover, knowing that in both 2006 and 2007, Popular had not reached the Committee's pre-established threshold performance level to pay incentive bonuses to its senior executives, the Compensation Committee set what it characterized as "Short-Term Incentive[s]" for the Company's senior managers, stating these "short term cash incentives were designed to reward achievement of annual profit goals." Defendants Chafey and Junquera were also granted hundreds of thousands of dollars in these "short term cash incentives" in January 2008. The Compensation Committee also authorized the continued provision to Carrión of a corporate jet, non-work related security and a New York apartment for personal use, and the continued provision to Carrión, Chafey and Junquera of Company-owned vehicles, country club memberships, and tickets to sponsored events which admittedly cost Popular tens of thousands of dollars a year to provide. Moreover, despite acknowledging the Company's exposure to the subprime real estate industry had already wreaked financial havoc on the Company's balance sheet and financial results, the Compensation Committee approved almost $2.5 million in compensation to

Carrión, over $800,000 in compensation to Junquera and over $2 million in compensation to Chafey in January 2008.

34.     Thereafter, on April 18, 2008, the Individual Defendants allowed and/or caused Popular to issue a press release announcing its financial results for the first quarter of 2008, the period ended March 31, 2008.  For the quarter, the Company now reported *a profit* of $103.3 million and basic and diluted earnings per common share ("EPS") of $0.36, per share.  Individual Defendant Carrión explained that while "the quarter was a difficult one as credit and markets continued to deteriorate," *Popular had "reduced [its] U.S. mortgage exposure."*  Addressing the factors underlying the Company's financial results in the first quarter, the Company's release also affirmatively stated that the Company had taken over $70 million in charge-offs on its non-performing loans and had increased reserves to the appropriate levels on the "specific commercial and construction loans it considered impaired."

35.     Thereafter, on May 6, 2008, with the Company's stock trading as high as $25 per share in intraday trading, the Individual Defendants allowed and/or caused Popular to announce that it was "planning to commence *a public offering of $350 million of non-cumulative perpetual preferred stock* pursuant to an existing effective Popular registration statement."  The registration statement, previously signed by Individual Defendants Carrión, Bermúdez, Ferré, Masin, Morales, Rexach, Teuber, Vizcarrondo, and Junquera, as well as Popular Director Frederic V. Salerno, on October 22, 2007 and declared effective by the SEC, expressly incorporated by reference "[a]ll documents that we file subsequent to the date of this prospectus and prior to the termination of the offering of our common stock contemplated hereby pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 . . . ."

36.     Thereafter, on May 22, 2008, the Individual Defendants allowed and/or caused the Company to price the previously announced public offering of non-cumulative perpetual preferred stock offering and to increase the offering size by $50 million *to $400 million*.  According to the Company's release issued that day, the "resulting offering of 16,000,000 shares was priced at 8.25% with a purchase price of $25 per share" and that it would be completed on May 28, 2008.  Because the Registration Statement issued in connection with the preferred stock offering was false and

misleading for the reasons detailed herein, Popular is now exposed to hundreds of millions of dollars in potential ***strict liability*** damages and/or rescission to the purchasers of these preferred shares for the misstatements alleged herein under §11 of the Securities Act of 1933.

37.     On July 17, 2008, the Individual Defendants allowed and/or caused Popular to issue a press release announcing its financial results for the second quarter of 2008, the period ended June 30, 2008.  For the quarter, the Company again reported ***a profit of $24.3 million*** and basic and diluted earnings per common share (EPS) of $0.06 per share.  In the release, Popular was forced to concede that the Company "continue[d] to feel the pressure of the turmoil in the financial markets and deteriorating economic conditions" and that it was now "fully engaged in the process of evaluating various strategic alternatives to improve the profitability of [its] operations in the United States," and that "[s]ome of these alternatives may involve the sale of some of these operations."  However, the release also quoted Individual Defendant Carrión as continuing to reassure investors, in pertinent part, that:

> ***Our banking and processing businesses in Puerto Rico continue to perform well despite a weak economy. Banco Popular de Puerto Rico met our expectations for the first half of the year with that segment reporting net income amounting to $191.3 million even with significant increases in its provision for loan losses.  In addition, we remain strongly capitalized with over $1 billion of Tier I capital in excess of the regulatory "well capitalized requirement."***

[Emphasis added.]

38.     Addressing the factors impacting the Company's financial results in the second quarter, the press release also stated:

> Financial results for the quarter ended June 30, 2008 were principally impacted by the following items (on a pre-tax basis compared to the second quarter of 2007):
>
> - Lower net interest income by $33.5 million due to the sale and reduction of various low margin assets;
>
> - Higher provision for loan losses for the second quarter of 2008, which increased by $75.5 million as compared with the same period in 2007;
>
> - Net losses attributable to changes in the fair value of Popular Financial Holdings' ("PFH") loans and bond certificates measured at fair value pursuant to SFAS No. 159 amounted to $35.9 million for the quarter ended June 30, 2008; and

- Lower net gain on sale of loans and valuation adjustments on loans held-for-sale by $29.7 million for the second quarter of 2008, with PFH and E- LOAN showing a reduction of approximately $34 million.

The above were partially offset by:

- ***Higher combined net gains on sale and valuation adjustments of investment securities and trading account profits by $32.9 million, primarily resulting from sales of agency*** securities ***and a higher volume of mortgage loans pooled and sold as mortgage-backed securities in the secondary markets in the Banco Popular de Puerto Rico reportable segment***. Refer to "Balance Sheet comments" for further information;

- Higher other non-interest income by $22.9 million;

- Lower operating expenses by $13.3 million; and

- Income tax benefit of $31.2 million for the second quarter of 2008, compared with income tax expense of $23.6 million for the same quarter in 2007.

[Emphasis added.]

39.    On August 29, 2008, Popular announced that it had sold the "loan and servicing assets of its U.S. mortgage subsidiary Popular Financial Holdings (PFH) to various Goldman Sachs affiliates" and that the "sale include[d] approximately $1,170 million in loans and mortgage servicing assets." The Company's release the Individual Defendants caused it to issue that day promised that ***the sale would "significantly reduce Popular's U.S. subprime assets."*** Popular also disclosed that it "expect[ed] to report a loss of approximately $450 million in connection with the transaction." Though Individual Defendant Carrión conceded in the release that Popular was "continuing to narrow the scope of [its] mainland U.S. operations…most exposed to the credit and mortgage markets, by leveraging on [its] core strengths in Puerto Rico, where [it was] the undisputed market leader," he still maintained that ***Popular's "core retail banking franchise in Puerto Rico [was] strong and continue[d] to perform well***."

40.    However, due to the Company's continuing weak 2008 financial results, in August 2008 the Individual Defendants caused Popular to reduce its quarterly dividend to $0.08 cents per quarter – or 50% from its previous quarterly dividend payment rate of $0.16 cents per quarter.

41.     Thereafter, on September 18, 2008, Popular announced the "sale of [the] manufactured housing loan assets of its U.S. mortgage subsidiary Popular Financial Holdings, or PFH, to 21st Mortgage Corp. and Vanderbilt Mortgage and Finance, Inc." According to the release the Individual Defendants caused the Company to issue that day, "Popular expect[ed] to report a pre-tax loss of approximately $70 million in connection with the sale announced today."

42.     On October 22, 2008, Popular was forced to issue a release disclosing a net loss of $668.5 million for its 3Q 2008.  In large part, the Company's release attributed "the decision announced two months ago to sell the assets and discontinue the operations of PFH" and the "partial valuation allowance on [Popular's] deferred tax assets related to [its] U.S. operations." However, defendant Carrión expressly maintained that ***Popular "[r]emain[ed] well capitalized and ha[d] raised liquidity to meet obligations through 2009."***  The Company's release issued that day ***again promised*** that the Company's 3Q 2008 losses included all of the appropriate asset write-downs, losses on the sale of loans and restructuring charges, and reductions in the Company's deferred tax assets related to its U.S. operations:

- Losses of $457.3 million, net of tax, related to the discontinued operations of the U.S.-based reporting segment Popular Financial Holdings ("PFH"). ***The losses included writedowns of assets, losses on the sales of loans and restructuring charges recorded in connection with actual sales and scheduled disposition of PFH's assets.*** Sales of PFH's portfolios in connection with the discontinuance of PFH's operations are expected to result in over $900 million in additional liquidity, of which $198 million was received in September 2008.  The loan sales completed in September 2008 and the expected asset sales to Goldman Sachs scheduled for the fourth quarter of 2008, reduce PFH's assets by more than $1.2 billion.  ***The results for the quarter also include the recording of a valuation allowance on deferred tax assets of $171.2 million.***

- ***Losses from continuing operations of $211.2 million primarily resulting from a valuation allowance of $189.2 million against the Corporation's deferred tax assets related to U.S. operations and higher provision for loan losses of $165.8 million as a result of higher credit losses, particularly in real estate related loans***.

[Emphasis added.]

43.     On November 3, 2008, Popular announced that it had "completed the sale of the loan and servicing assets of its U.S. mortgage subsidiary Popular Financial Holdings, Inc. to various Goldman Sachs affiliates" and that the "sale would result in a reduction of approximately $900M in

loans and mortgage servicing assets that are mainly accounted at fair value, providing Popular with more than $700 million in additional liquidity *and significantly reducing Popular's U.S. subprime assets*." In the Company's release, Individual Defendant Carrión conceded the asset sale was required to "reduc[e] the size of [Popular's] footprint in the mainland U.S. to *a level better suited to present economic conditions while taking steps to improve profitability across our business*."

44.     On November 18, 2008, Popular was forced to announce it had had to seek government funds from "the U.S. Department of the Treasury's (the "Treasury") Capital Purchase Program ("CPP") under the Troubled Assets Relief Program ("TARP")." As a result, Popular would be forced to issue and sell the U.S. Treasury $950 million worth of newly issued shares of preferred equity stock. In the Company's release that day, Individual Defendant Carrión now conceded that the TARP investment was required "to improve[] the liquidity and capital position of Popular" so that it could continue to "meet the needs of [its] customers and communities in the current challenging economic environment."

45.     Finally, on January 22, 2009, the Individual Defendants began to disclose the truth about the Company's financial position and caused Popular to issue a press release announcing its financial results for the fourth quarter and year end of 2008, the period ended December 31, 2008. For the quarter, the Company reported a net loss of $702.9 million. Individual Defendant Carrión conceded that *Popular's "substantial loss for the fourth quarter [was] principally caused by a significant increase in the allowance for loan losses and the valuation allowance equal to 100% of the deferred tax asset related to [its] U.S. mainland operations" and that the "provision for loan losses increased particularly in the construction sector in Puerto Rico and in the U.S. mainland and the mortgage related loans in [Popular's] U.S. mainland portfolios."* Addressing the specific factors requiring that Popular finally recognize such a large loss, the press release emphasized, among other things, the Company's previously undisclosed credit loss understatements, understated (and under-reserved) loan loss provisions, unreported asset impairments, overstated deferred tax assets related to Popular's U.S. operations, declining yields in the Company's loan and investment portfolios, higher loan net charge-offs, understated (and under-reserved) specific reserves for commercial, construction

and mortgage loans, and the fact that "home equity lines of credit and second lien mortgage loans" Popular issued were "behaving as unsecured loans due to devaluation in [the] real estate" market, stating in relevant part that:

> The following principal items impacted the Corporation's continuing operations financial results for the quarter ended December 31, 2008, when compared to the same quarter in the previous year:
>
> - *higher provision for loan losses by $267.1 million as a result of higher credit losses and increased specific reserves for impaired loans;*
>
> - *valuation allowance on the Corporation's deferred tax assets related to the U.S. operations of $462.8 million recorded during the fourth quarter of 2008; and*
>
> *        *        *
>
> - Net income for the Banco Popular de Puerto Rico ("BPPR") reportable segment for the quarter ended December 31, 2008 amounted to $12.4 million, compared to $80.2 million in the same quarter of the previous year. *The financial results were principally impacted by an increase in the provision for loan losses of $112.7 million primarily related to the commercial and construction loan portfolios. During the fourth quarter of 2008, several commercial and construction loans in the BPPR reportable segment reported further deterioration due to current economic conditions requiring their classification as impaired loans under SFAS No. 114 or an increase in their specific reserves. As of December 31, 2008, there were $639 million of SFAS No. 114 impaired loans in the BPPR reportable segment with a related specific allowance for loan losses of $137 million. During this fourth quarter, the Corporation recorded $101 million in provision for loan losses for loans classified as impaired under SFAS No. 114 in the BPPR reportable segment, of which $79 million pertained to residential construction loans.*
>
> BPPR's reportable segment net interest income for the fourth quarter of 2008 declined $13.8 million, compared to the same quarter in the previous year. *This decrease was principally related to lower volume of investment securities and to lower yields in the loan and investment portfolios,* partially offset by lower cost of funds. Despite the impact of the unprecedented market conditions and historical reductions in interest rates by the Federal Reserve ("FED"), the BPPR reportable segment maintained a healthy net interest margin that approximated 3.89% for the quarter ended December 31, 2008, compared to 3.91% in the same quarter of the previous year. Non-interest income increased for the quarter by $10.4 million, or 8%, principally in other service fees and service charges on deposits accounts. Operating expenses in this reportable segment decreased by $3.4 million when comparing quarterly periods. This decline was partly the result of successful control management efforts and reduced compensation tied to financial performance.
>
> - Banco Popular North America ("BPNA") reportable segment reported net losses of $349.5 million for the quarter ended December 31, 2008, compared to net losses of $218.3 million in the fourth quarter of 2007. *The quarterly financial results were principally impacted by an increase in the provision for loan losses of $156.4 million. The increase in the provision for loan losses considered higher loan net*

- 17 -

*charge-offs, specific reserves for commercial, construction and mortgage loans, as well as the impact of the deterioration in the U.S. residential housing market that has also affected home equity lines of credit and second lien mortgage loans which are behaving as unsecured loans due to devaluation in real estate.* This reportable segment also recognized a valuation allowance on deferred tax assets of $200.1 million during the fourth quarter of 2008. These unfavorable variances were in part offset by the reduction in impairment losses on intangible assets of E-LOAN which was previously described.

During the quarter ended December 31, 2008, the BPNA reportable segment recorded approximately $33.8 million in charges such as severance costs, lease cancellations, and write-downs of intangibles and long-lived assets that were associated to the restructuring plans of its banking operations and E-LOAN. As indicated in the Form 10-Q filed on November 10, 2008, in October 2008, the Corporation's *Board* of Directors approved a restructuring plan for BPNA with the objective of reducing the size of its banking operations in the U.S. mainland to a level suited to present economic conditions, improve profitability in the short term, increase liquidity and lower credit costs and, over time, achieve a greater integration with corporate functions in Puerto Rico. Also, the Board of Directors approved a plan for E-LOAN to cease operating as a direct lender effective in the fourth quarter of 2008. Refer to the Corporation's Form 10-Q for the quarter ended September 30, 2008 for further information.

The integration of both banking subsidiaries, BPPR and BPNA, under one management *continues* to be implemented, as part of the previously announced restructuring plan for the U.S. operations. The business divisions of retail banking and commercial banking, in addition to administrative and operational personnel, at Banco Popular North America, are now reporting to management in Puerto Rico.

Losses of $75.2 million, net of tax, related to the discontinued operations of Popular Financial Holdings ("PFH") in the U.S. mainland for the fourth quarter of 2008. The net losses for the *quarter* ended December 31, 2008 corresponding to the discontinued operations included $37.8 million in valuation allowances on the Corporation's deferred tax assets. Also, the net loss included non-interest losses of $24.3 million for the quarter ended December 31, 2008 consisting of additional write-downs in loans accounted at fair value as of year end and the final impact of the sale of assets to Goldman Sachs announced in the third quarter of 2008 and that closed in November 2008. Operating expenses for the discontinued operations amounted to $34.1 million for the fourth quarter of 2008, which primarily included charges related to the final settlement on the sale to Goldman Sachs, personnel costs and other restructuring charges related to the discontinuance of the operations. As of December 31, 2008, PFH holds only $13 million in assets, of which $7 million are loans measured at fair value.

### *Net Loss from Continuing Operations - Fourth Quarter 2008 compared to Fourth Quarter 2007:*

* * * *

### *Net Interest Income*

Net interest income for the fourth quarter of 2008 was $288.9 million, compared with $337.3 million for the fourth quarter of 2007. The decrease was due to a decline of

$1.3 billion in average earning assets, together with a reduction of 40 basis points in the net interest margin.

*      *      *

***The decline in average earning assets was due mostly to the runoff of investment securities as part of a strategy of deleveraging the balance sheet.*** The reduction in the average balance of investment securities was used to repay short-term borrowings, including repurchase agreements. In the loan portfolio, an increase in average commercial loans outstanding was offset in part by declines in mortgage and auto loans.

The decline in the net interest yield was driven by a reduction in the yield of earning assets. This was caused primarily by the decline in the yield of commercial loans, which have a significant amount of floating rate loans whose yield decreased as the Fed cut the funds rate in 2008. The Fed lowered the federal funds target rate between 400 and 425 basis points from December 31, 2007 to December 31, 2008. Also contributing to the reduction in the yield of commercial loans is the substantial increase in non-performing loans as described later in this press release. The Corporation's average cost of funds decreased driven by a reduction in the cost of deposits and short-term borrowings.

Offsetting partially the decline in the cost of deposits and short-term borrowings was an increase in the cost of long-term borrowings. During 2008, certain medium-term notes matured which had been issued in previous years at relatively low rates were some replaced with more expensive term funds whose cost reflects the current distressed conditions of the credit markets. Also contributing to the reduction in the net interest yield was the net loss for the year which reduced available funds obtained through capital.

### *Provision for Loan Losses and Credit Quality*

The provision for loan losses in the continuing operations totaled $388.8 million, or 174% of net charge-offs, for the quarter ended December 31, 2008, compared with $121.7 million or 157%, respectively, for the same quarter in 2007, and $252.2 million, or 148%, respectively, for the quarter ended September 30, 2008. The provision for loan losses for the quarter ended December 31, 2008, when compared with the same quarter in 2007, reflects higher net charge-offs by $146.2 million, mainly in construction loans by $63.0 million, consumer loans by $28.8 million, commercial loans by $37.0 million, and mortgage loans by $15.1 million. Provision and net charge-off information for prior periods was retrospectively adjusted to exclude discontinued operations for comparative purposes.

The higher level of provision for the quarter ended December 31, 2008 was mainly attributable to the continuing deterioration in the commercial and construction loan portfolios due to current economic conditions in Puerto Rico and the U.S. mainland. Credit deterioration trends in the Corporation's commercial loan portfolio are reflected across all industry sectors. The allowance for loan losses for commercial and construction credits has increased, particularly the specific reserves for loans considered impaired. Also, deteriorating economic conditions in the U.S. mainland housing market have impacted the mortgage industry delinquency rates. The Corporation has recorded a higher provision for loan losses in the fourth quarter of 2008 to cover for inherent losses in the mortgage portfolio of the Corporation's U.S.

mainland operations as a result of higher delinquencies and net charge-offs, and consideration of troubled debt restructurings in the mortgage portfolio, principally from the non-conventional business of Banco Popular North America. Furthermore, consumer loans net charge-offs rose principally due to higher losses on home equity lines of credit and second lien mortgage loans of the Corporation's U.S. mainland operations, which are categorized by the Corporation as consumer loans. The deterioration in the delinquency profile and the declines in property values have negatively impacted charge-offs.

….The allowance for loan losses represented 3.43% of loans held-in-portfolio at December 31, 2008, compared with 2.76% at September 30, 2008 and 1.96% at December 31, 2007. As of December 31, 2008, there were $898 million of SFAS No. 114 impaired loans in the Corporation's continuing operations with a related specific allowance for loan losses of $195 million, compared with impaired loans of $291 million and a specific allowance of $53 million as of December 31, 2007, excluding PFH.

During the quarter ended December 31, 2008, the Corporation recorded $150 million in provision for loan losses for loans classified as impaired under SFAS No. 114. As of September 30, 2008, there were $753 million of SFAS No. 114 impaired loans in the Corporation's continuing operations with a related specific allowance for loan losses of $131 million.

Non-performing assets of the continuing operations totaled $1.3 billion at December 31, 2008. This represented an increase of $192 million since September 30, 2008 primarily related to increases in construction loans by $84 million, mortgage loans by $57 million, commercial loans by $24 million, consumer loans by $10 million and other real estate by $17 million. Non- performing assets from continuing operations increased by $672 million from December 31, 2007 to the same date in 2008. The increases were mostly reflected in commercial loans by $207 million, construction loans by $230 million, mortgage loans by $168 million, consumer loans by $26 million and other real estate by $40 million.

\* \* \* \*

*Income Taxes*

Income tax expense from continuing operations amounted to $309.1 million for the quarter ended December 31, 2008, compared with an income tax benefit of $15.4 million for the same quarter of 2007. *As previously indicated, the variance was primarily due to the establishment of a full valuation allowance on the deferred tax assets of the U.S. mainland operations, as well as the impact of higher operating losses.*

The Corporation's net deferred tax assets (prior to deducting the valuation allowance) amounted to $1.2 billion as of December 31, 2008, of which $848 million pertains to the U.S. mainland operations. As of December 31, 2008, the Corporation recorded a total valuation allowance of $861 million on the deferred tax assets of the Corporation's U.S. operations. This full valuation allowance was recorded in consideration of the requirements of SFAS No. 109 "Accounting for Income Taxes" ("SFAS No. 109") which states that a deferred tax asset should be reduced by a valuation allowance *if based on the weight of all available evidence, it is more likely than not (a likelihood of more than 50%) that some portion or all of the deferred tax*

***asset will not be realized.*** The determination of whether a deferred tax asset is realizable is ***based*** on weighting all available evidence, including both positive and negative evidence. SFAS No. 109 provides that the realization of deferred tax assets, including carryforwards and deductible temporary differences, depends upon the existence of sufficient taxable income of the same character during the carryback or carryforward period. SFAS No. 109 requires the consideration of all sources of taxable income available to realize the deferred tax asset, including the future reversal of existing temporary differences, future taxable income exclusive of reversing temporary differences and carryforwards, taxable income in carryback years and tax planning strategies.

***The Corporation's U.S. mainland operations are in a cumulative loss position for the three-year period ended December 31, 2008. For purposes of assessing the realizability of the deferred tax assets in the U.S. mainland, this cumulative taxable loss position, along with the evaluation of all sources of taxable income available to realize the deferred tax asset, as discussed above, is considered significant negative evidence and has caused management to conclude that the Corporation will not be able to fully realize the deferred tax assets in the future,*** considering solely the criteria of SFAS No. 109. Management will reassess the realizability of the deferred tax assets based on the criteria of SFAS No. 109 each reporting period. If future events differ from management's year-end 2008 assessment, a partial reversal of the valuation allowance may be required in future years. An important consideration, although not sufficient positive evidence to overcome the negative evidence under SFAS No. 109, is that the net operating loss carryforwards of the Corporation's U.S. operations have an expiration term of 20 years. To the extent that the financial results of the U.S. operations improve and the deferred tax asset becomes realizable, the Corporation will be able to reduce the valuation allowance through earnings.

[Emphasis added.]

46.     In response to these disclosures, shares of the Company's common stock fell $2.52 per share, or 50%, to close at $ 2.46 per share, on heavy trading volume.  In January 2009, the Individual Defendants also caused Popular to further reduce its quarterly dividend to $0.02, a 75 % reduction to the previous quarterly dividend payment rate of $0.08 cents per quarter that had been established with the 50% dividend cut (from $0.16 cents per share) announced in August 2008.

47.     Thereafter, on May 18, 2009, Fitch Ratings put Popular's and its subsidiaries ratings on "Rating Watch Negative," stating "[t]oday's actions reflect Fitch's view that these institutions show an incrementally higher level of vulnerability to the credit deterioration which Fitch expects to continue across virtually all loan categories."

48.     Finally, citing the Company's deteriorating financial condition, on May 21, 2009 Popular was forced to announce it was not in the process of shuttering more than 20% of its U.S. branch network to cut costs.

## DERIVATIVE ALLEGATIONS AND DEMAND FUTILITY

49.    Plaintiff is, and at relevant times was, a holder of Popular's common stock.  Plaintiff brings this action derivatively in the right of and for the benefit of the Company to redress injuries suffered by the Company as a direct result of Individual Defendants' wrongdoing.

50.    As of the filing of this complaint, the Popular Board of Directors consists of Individual Defendants Carrión, Junquera, Morales, Rexach, Bermúdez, Ferré, Teuber,Vizcarrondo, and Masin and non-party Frederic V. Salerno ("Salerno") who has served as a Director of Popular since 2003 (collectively, these Individual Defendants and Salerno are referred to herein as the "Popular Board").  Plaintiff did not made any demand on the Members of the Popular Board to institute this action because such demand would be a futile and useless act for the following reasons:

(a)    Demand is excused because the conduct alleged herein, including permitting and/or causing Popular to undertake the $400 preferred stock offering utilizing a false and misleading registration statement – despite exposing the Company's to hundreds of millions of dollars in potential *strict liability* under the Securities Act – was so reckless on its face that it could not have been the product of sound business judgment.  In fact, each of the Members of the Popular Board signed the false and misleading registration statement and was thus responsible for ensuring its accuracy.  Meanwhile, each of the Members of the Popular Board had knowledge of the "storm warnings" available alerting them of Popular's impending asset impairments, reserve understatements, and other problems stemming from the Company's exposure to toxic assets on its balance sheet and overstatement of its deferred tax liability.  Had these defendants caused the Company to promptly write down the impaired assets, write off the non-performing loans, increase its loan loss reserves to adequate levels and reduce the inflated deferred tax liability being reported on its books, the Company's reported assets and income would have been significantly diminished, but the Company would not be exposed to liability now.  Nonetheless, each Member of the Popular Board facilitated the Company's exposure to liability under the Exchange Act and the Securities Act by causing the Company to conduct the registered $400 million preferred stock offering in violation of their fiduciary duties to Popular.  Moreover, each Individual Defendant caused and/or permitted

- 22 -

Popular to issue the false and misleading statements and financial reports detailed herein at ¶¶30-45, exposing the Company to immense liability under the Exchange Act to purchasers of its common stock between January 23, 2008 and January 22, 2009.

(b)     Although the Members of the Popular Board were required pursuant to their fiduciary duties as Popular Board members and as members of specific committees of the Company's Board to monitor and ensure that the operations of the Company were based on sound business judgment, the Members of the Popular Board failed to exercise their duties, and rather, simply deferred their judgment to Individual Defendants Carrión and Junquera, thereby causing and/or permitting Popular to engage in the reckless and misleading conduct described above, exposing the Company to immense civil liability, including hundreds of millions of dollars in potential fines, penalties, civil judgments and defense costs and reputational harm.

(c)     During the relevant period, the Popular Audit Committee consisted of Individual Defendants Bermúdez, Rexach and Teuber, and non-party Salerno (Chairman).  Among other things, Popular's Audit Committee Charter charged its members with: (i) overseeing  the integrity of Popular's financial statements, including policies, procedures and practices regarding the preparation of financial statements, the financial reporting process, disclosures, and the internal control over financial reporting; (ii) overseeing Popular's internal audit function and the qualifications, independence and performance of its outside auditors; and (iii) investigating any matters brought to its attention or initiated on its own and that it was provided full access to all of the Company's books, records and personnel of the Company.  Despite this charter, the Members of the Popular Board appointed to this committee during the relevant period failed to perform proper due diligence and inform themselves about and oversee the Company's affairs, exposing Popular to immense civil liability, including hundreds of millions of dollars in potential fines, penalties, civil judgments and defense costs and reputational harm.

(d)     Specifically, the Members of the Popular Board, including the Audit Committee members, also: (i) caused and/or permitted Popular to inadequately reserve for losses on its real estate portfolio, which caused its balance sheet and financial results to be artificially inflated

- 23 -

throughout the relevant period; (ii) failed to adequately monitor the Company's finances during the relevant period, including the Company's failure to write down impaired assets, which caused its balance sheet and financial results to be artificially inflated; (iii) failed to adequately monitor and enforce the Company's internal controls, which led to the Company improperly reporting its loan reserves during the relevant period; (iv) failed to adequately monitor or uncover that the Company's capital base was not adequate enough to withstand the significant deterioration in the real estate market and, as a result, Popular was be forced to raise additional capital, including seeking assistance from the U.S. Government; and (v) failed to adequately review the Company's financial statements as such that the Company had no reasonable basis to make projections about its non-performing assets, its net charge-offs and its ability to liquidate its troubled loan portfolio during the relevant period, breaching their fiduciary duties and exposing Popular to immense civil liability, including hundreds of millions of dollars in potential fines, penalties, civil judgments and defense costs and reputational harm..

(e)     The Popular Board's Compensation Committee consisted of Defendants Rexach (Chairman), Bermúdez, Ferré, Morales, and Teuber during the relative period.  Among other things, Popular's Audit Committee Charter charges its members with overseeing Popular's compensation policies and practices, including designing and implementing adequate insider trading provisions, to ensure that Popular's executives are not incentivized to operate the Company in a reckless fashion or to take on undue risk in the race to report financial results that directly influence their own compensation.  Rather than complying with their fiduciary duties and the mandate of the Compensation Committee's Charter, these defendants caused Popular to incentivize risk-taking and financial misreporting by its senior executives and employees.  In fact, once Popular obtained its TARP funds, in order to bring its compensation principles in line with TARP-recipient mandates, the Compensation Committee has already been required to undertake measures to slash $34 million in compensation expenses, including taking a "reduction in executive salaries ranging from 5% to 10%, affecting 79 executives, and elimination of certain executive perquisites such as country club memberships," implementing a "suspension of the Corporation's matching contributions to the

Puerto Rico and United States pre-tax defined contribution savings plans," and implementing a "suspension of additional benefit accruals in the Banco Popular de Puerto Rico Retirement Plans and the Benefit Restoration Plan."  In light of having caused Popular to incentivize reckless risk-taking during the relevant period, each of the Compensation Committee members breached their fiduciary duties and exposed Popular to immense civil liability, including hundreds of millions of dollars in potential fines, penalties, civil judgments, defense costs and reputational harm.

    (f) The Members of the Popular Board, including the Audit Committee and Compensation Committee members, participated in, acquiesced in, or approved the acts or omissions or recklessly disregarded the wrongs alleged herein, and did so in affirmative violation of their fiduciary duties to the Company and its shareholders and have permitted the wrongs alleged or have remained inactive although they had knowledge or notice of those wrongs.

    (g) Through gross negligence, mismanagement or reckless or intentional misconduct, each Member of the Popular Board exposed Popular to potential civil liability, hundreds of millions of dollars in potential fines, penalties and damages in connection with the pending securities class action lawsuit, and irreparably diminished Popular's reputation and standing in the financial community.

    (h) Because of their participation in the mismanagement of the Company, gross dereliction of fiduciary duties, breaches of the duties of good faith and loyalty, waste of Popular's corporate assets, and abuse of their control of Popular, the Members of the Popular Board are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities class action lawsuit brought under the Exchange Act and, if later filed, liability for violations of the Securities Act.  The Members of the Popular Board cannot defend their actions by any alleged "independent" business judgment since each of them acted in bad faith, grossly and recklessly abused their discretion, acted in breach of their fiduciary duties to the Company and its stockholders and failed to act and abdicated their functions and duties as directors.

(i)       A majority of the Members of the Popular Board are not independent either because they are subject to liability for the misconduct alleged herein or, by virtue of their personal, professional and/or financial relationships with the Members of the Popular Board who are subject to liability for the misconduct alleged herein, are conflicted from complying with their fiduciary duties and prosecuting the claims alleged herein for the following, and other, reasons:

(i)       ***Threats to Livelihood.***  As executive directors of Popular, Individual Defendants Carrión and Junquera are beholden to the other Members of the Popular Board to maintain their livelihood and for this reason are unable to comply with fiduciary duties to diligently investigate and prosecute the other Members of the Popular Board for the misconduct alleged herein.

(ii)      ***Disabling Familial Relationships.***  Individual Defendant Carrión is the uncle of defendant Vizcarrondo and Popular concedes the close familiar relationship impairs both defendants' independence.  Similarly, two sons and a daughter-in-law of Individual Defendant Rexach are employed as Vice President of the Business Banking Division of the Bank, Project Coordinator of the Product Development area in the Card Products Division of the Bank, and as an Assistant Vice President of the Trust Division of the Bank, respectively; the son of defendant Morales is employed as Senior Vice President of the Ticketpop Networks Division of EVERTEC, Inc. (a subsidiary of Popular); a brother of defendant Vizcarrondo and nephew of defendant Carrión is employed as a Vice President in the Merchant Business Administration Division of the Bank; the son of defendant Junquera is employed as an Assistant Vice President in the Corporate Finance and Advisory Services Division of the Bank;

(iii)     ***Direct Participation.***  As hands-on managers of Popular, Individual Defendants Carrión and Junquera personally orchestrated the misconduct alleged in this action and thus would be biased in determining whether to bring suit against themselves;

(iv)      ***Cross Board Memberships.***  Individual Defendant Carrión has served as a director of Verizon Communications, Inc. since 1995, where non-party Salerno served as vice chairman and chief financial officer until 2002.  By virtue of their long-term personal, professional and financial relationships, including the fact that Carrión oversaw Salerno's livelihood and

- 26 -

compensation for many years, Salerno is beholden to Carrión and could not impartially investigate and/or prosecute the misconduct alleged herein;

(v)     ***Cross Board Memberships and Threat to Professional Reputation and Livelihood.***  Individual Defendant Carrión has served as Chairman of the Board of Trustees of Fundación Banco Popular, Inc. since 1982 and Individual Defendant Morales has been a member of that board since 1981.  Individual Defendant Morales has also served as president of Parkview Realty, Inc. since 1985, the Atrium Office Center, Inc. since 1996, HQ Business Center P.R., Inc. since 1995, and other entities engaged in real estate leasing.  By virtue of the fact that Morales' livelihood is encumbant upon building and maintaining relationships with executives like Carrión and the executives of other banks and firms engaged in the real estate industry, and Morales' long-term personal, professional and financial ties to Carrión, Morales cannot independently investigate or prosecute the claims alleged herein against Carrión or the other Members of the Popular Board beholden to Carrión as it would be against his economic self-interest to do so.

(vi)    ***Threats to Professional Reputation and Livelihood.***  Individual Defendant Vizcarrondo has also served as president, CEO and partner of Desarrollos Metropolitanos, L.L.C., a general construction company, since 2004, and as a member of the board of directors of the Puerto Rico Chapter of the National Association of Home Builders since 2002. By virtue of the fact that Vizcarrondo's livelihood is incumbent upon building and maintaining relationships with executives like Carrión and the executives of other banks and firms engaged in the Puerto Rico real estate industry, and Vizcarrondo's long-term personal, professional and financial ties to Carrión, Vizcarrondo cannot independently investigate or prosecute the claims alleged herein against Carrión or the other Members of the Popular Board beholden to Carrión as it would be against his economic self-interest to do so.

(vii)   ***Increased Exposure to Personal Liability.***  Individual Defendant Rexach also serves as a Director of the Bank, Popular International Bank, Inc., Popular North America, Inc., Banco Popular North America, Banco Popular de Puerto Rico, Popular Cash Express, Inc. and Equity One, Inc.  By virtue of these other directorships, Individual Defendant Rexach is

- 27 -

charged with a higher degree of knowledge, skill and oversight over Popular's day-to-day operations than a traditional "outside director" would be and as such, Rexach faces increased exposure to personal liability if the claims alleged herein are prosecuted.

           (viii)    **_Increased Exposure to Personal Liability._**   Having served as Chairman and as a member of the Trust Committee of the Bank since 1996, Individual Defendants Bermúdez and Vizcarrondo, respectively, were charged with a higher degree of oversight over Popular's day-to-day operations than a traditional "outside director" would be and as such, these defendants face increased exposure to personal liability.

           (ix)    **_Threats to Livelihood._**  Individual Defendant Masin served vice chairman and chief operating officer of Citigroup from 2002 to 2004 and has served as a trustee of the Weill Family Foundation since 2002.  Citigroup and Popular Securities served as co-underwriters for scores of public offerings during the relevant period.  By virtue of his personal, professional and financial relationships with the executives at Citigroup and Popular, Masin is disabled from complying with his fiduciary duties and diligently investigating and prosecuting the claims alleged herein;

           (x)    **_Threats to Livelihood._**  Individual Defendant Masin was a senior partner at the international law firm of O'Melveny & Myers until February 2008.  The law firm's website boasts that its "corporate finance lawyers represent some of the largest and most sophisticated private equity firms, corporations, banks and investment funds, as borrowers and lenders, issuers and investors, in financing and debt investing transactions in the principal debt markets in the United States, Asia, and Europe" and lists as practice specialties "asset-based financings, bridge loans, corporate credit facilities, distressed debt investing, high yield bond financings, investment credit facilities, letter of credit facilities, leveraged acquisition and recapitalization financings, mezzanine debt financings, private placements, senior secured credit facilities, subordination and intercreditor arrangements, venture debt financing and workouts and restructurings," all of which would put O'Melveny & Myers' partners in constant contact with Popular Securities.  Though Masin left O'Melveny & Myers in February 2008, upon information and

belief he retains a financial interest in O'Melveny & Myers' profits and maintains long-term personal, professional and financial ties with the firm's partners and its clients.  As such, Individual Defendant Masin's ability to diligently investigate and prosecute the claims alleged herein would be unduly impeded as doing so would threaten his livelihood and financial interests.

(xi)   ***Cross Board Memberships.***   Individual Defendant Ferré is the president and a trustee of the Fundación Luis A. Ferré, a foundation.  In December 2005, the Bank entered into a commitment to contribute a total of $500,000 to the Fundación Luis A. Ferré during a period of five years in connection with the remodeling of the Ponce Museum of Art premises. The second payment in the amount of $100,000 was made in December 2007. During 2007, the Bank also made a contribution of $50,000 to the Fundación Luis A. Ferré in connection with the sponsorship of the Ponce Museum of Art Benefit Gala.  By virtue of the fact that Ferré is employed and derives her livelihood from the foundation, a significant beneficiary of Popular, Ferré's independence is compromised and she would be unable to comply with fiduciary duties to Popular and its investors in diligently investigating and prosecuting the claims alleged herein against Carrión or any of the other Members of the Popular Board.

(j)   Based on the particularized facts above, to properly prosecute this lawsuit, the Members of the Popular Board would have to sue themselves, requiring them to expose themselves and their colleagues to potentially hundreds of millions of dollars in civil liability and sanctions. This they will not do.

(k)   Further, the Company's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste, and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, which they caused the Company to purchase with corporate funds for their protection – monies belonging to Popular stockholders.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Members of the Popular Board in this case contain provisions which eliminate coverage for any action brought directly by Popular against these Members of the Popular Board, known as,

*inter alia*, the "insured versus insured exclusion." As a result, if the Members of the Popular Board were to sue themselves or certain Company officers, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effect a recovery.

51.     In sum, because the Members of the Popular Board made a conscious business decision to breach their fiduciary duties by causing Popular to conduct the $400 million preferred stock offering utilizing a registration statement they knew contained false and misleading statements, or were at least reckless in not ensuring that it did not, thereby exposing Popular to immense liability under the federal securities laws, they are not entitled to business judgment deference for the misconduct alleged herein. Moreover, as demonstrated above (and summarized in the chart below), because each Member of the Popular Board permitted and/or caused Popular to issue the false and misleading statements detailed above during the relevant period, and/or improvidently deferred judgment to Individual Defendants Carrión, Junquera and Chafey to whom a majority of the Members of the Popular Board are beholden, a majority of the Members of the Popular Board are not disinterested and independent, the alleged misconduct was not the product of their valid exercise of business judgment, and for these and the other reasons detailed herein, a presuit demand was not required as it would have been futile:

| BOARD MEMBER/ DISABLING CONFLICT | SIGNED REG. STMNT. | AUDIT COMM. MEMB. | COMP. COMM. MEMB. | DISABLING THREAT TO LIVELIHOOD | DISABLING FAMILIAR RELATIONSHIPS | CROSS BOARD MEMBERSHIPS | INCREASED EXPOSURE TO PERSONAL LIABILITY |
|---|---|---|---|---|---|---|---|
| CARRIÓN | X | | | X | X | X1, X2, X3 | X |
| JUNQUERA | X | | | X | X | | X |
| MORALES | X | | X | X | X | X1 | |
| REXACH | X | X | X | | X | | X |
| BERMÚDEZ | X | X | X | | | | X |
| FERRÉ | X | | X | | | X2 | |
| TEUBER | X | X | X | | | | |
| VIZCARRONDO | X | | | X | X | | X |
| MASIN | X | | | X | | | |
| SALERNO | X | X | | | | X3 | |

## AIDING AND ABETTING AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, each Individual Defendant has pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.   In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.     The purpose and effect of the Individual Defendants' common course of conduct was, among other things, to disguise their violations of law and breaches of fiduciary duty, and to enhance executive and directorial positions and receive substantial compensation and/or fees as a result thereof.

54.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the relevant period.  During this time, the Individual Defendants caused the Company to conceal the true fact that Popular was misrepresenting the financial status of its business and financial results.

55.     The Individual Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently violate state and federal law, the federal securities laws, and abdicate their duties as directors.  Each Individual Defendant was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.

56.     Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

57.     At all times relevant hereto, each Individual Defendant was an agent of each of the other Individual Defendant and were at all times acting within the course and scope of such agency.

## COUNT ONE
## Breach of Fiduciary Duty

58.     Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

59.     The Individual Defendants each owed Popular and its shareholders the highest fiduciary duties of loyalty, good faith and due care in managing and administering the Company's affairs.

60.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls and financial affairs of Popular.  By virtue of their duties of loyalty, good faith and due care:

(a)     The Individual Defendants were required to exercise reasonable control and supervision over the Company's officers, employees, agents, business, and operations;

(b)     The Individual Defendants were required to make inquiries, use sound business judgment, and remain informed about Popular's financial performance and operations, and upon receiving notice or information of an imprudent, unsound or unlawful decision, condition, or practice, the Individual Defendants were required to undertake a reasonable investigation in connection therewith, were required to undertake steps to correct the decision, condition, or practice, and to make public disclosure of such decisions, condition, or practices in a timely and forthright manner; and

(c)     The Individual Defendants were required to accurately calculate and report to Popular's shareholders the value of the Company's assets, including its real estate loan portfolio.

61.     The Individual Defendants breached their fiduciary duties owed to Popular and its shareholders, or aided and abetted in the breach of other defendants' fiduciary duties, by willfully, recklessly and intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets, unnecessarily expend corporate funds, and failed to properly oversee Popular's business, rendering them personally liable to the Company.

62.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial health of the Company and failed to correct those representations.

63.     All Individual Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

64.     The Individual Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their high-level positions in the Company.

65.     As a direct and proximate result of Individual Defendants' breaches of their fiduciary duties of loyalty, good faith and due care, and aiding and abetting those breaches, as alleged herein, Popular has sustained and continues to sustain significant damages and a drastic diminution in value. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT TWO**
**Gross Mismanagement**

66.     Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

67.     As detailed more fully herein, the Individual Defendants each owed a duty to Popular and its shareholders to prudently supervise, manage and control Popular's operations.

68.     The Individual Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties to prudently manage Popular's business and assets.

69.     As such, the Individual Defendant subjected Popular to the unreasonable risk of substantial losses by failing to exercise due care and by failing to use sound business judgment, including their failure to understand and monitor the Company's fiscal and financial performance. The Individual Defendants breached their duties of due care and diligence in managing and administering Popular's affairs and by failing to prevent a waste of Company assets.

70.     When discharging their duties, the Individual Defendants knew or recklessly disregarded the wrongful conduct described herein, and either approved management's activities or

failed to supervise such activities in accordance with their duties.  The Individual Defendants grossly mismanaged or aided and abetted the gross mismanagement of Popular and its assets.

71.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of loyalty, good faith, and due care, Popular has sustained damage and continues to sustain significant damages and a drastic diminution in value.  As a result of the misconduct alleged herein, all Individual Defendant are liable to the Company.

**COUNT THREE**
**Waste of Corporate Assets**

72.     Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

73.     Because of the Individual Defendant's misconduct, Popular will incur costs and fees in the millions of dollars defending lawsuits and satisfying adverse judgments or settlements.

74.     As a result of the conduct alleged herein, the Individual Defendants have unreasonably and unnecessarily caused Popular to waste valuable corporate assets.

75.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of loyalty, good faith, and due care, Popular has sustained and continues to waste precious corporate assets and thus sustain damage.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**PRAYER FOR RELIEF**

76.     WHEREFORE, Plaintiff prays for judgment in the Company's favor against the Individual Defendants as follows:

A.     Determining this action is a proper derivative action, Plaintiff is an adequate representative on the Company's behalf, and demand is excused;

B.     Determining the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Popular;

C.     Declaring that the Individual Defendants are obligated to indemnify and hold Popular harmless from any fines, penalties, judgment, settlement or award pursuant to any of the

class actions pending or to be filed against Popular or its employees or agents arising out of the breaches of duty and wrongdoing alleged herein;

       D.     Awarding Popular the damages it sustained due to the violations alleged herein from each of the Individual Defendants jointly and severally, together with interest thereon;

       E.     Awarding Popular exemplary damages in an amount necessary to punish the Individual Defendants and to make an example of the Individual Defendants to the community according to proof at trial;

       F.     Awarding Popular restitution from each Individual Defendant;

       G.     Awarding Popular equitable or injunctive relief as permitted by law;

       H.     Awarding pre-judgment and post-judgment interest as allowed by law;

       I.     Awarding Plaintiff the costs and disbursements of this derivative action, including reasonable attorneys' fees, costs and expenses; and

       J.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

DATED: June 5th, 2009          LUIS E. MIÑANA & ASSOC.
                                 ABOGADOS – NOTARIOS


                                 S/ Luis E. Miñana USDC # 225,608
                                 LUIS  E.  MIÑANA
                                 122 Ave, Dómenech Altos
                                 Urb. Baldrich
                                 San Juan, P. R. 00918
                                 Telephone: 787-758-1999
                                 Facsimile: 787-773-0500
                                 Email: notarial@prtc.net


                                 ~and~

SCOTT + SCOTT LLP
ARTHUR SHINGLER III
MARY K. BLASY
LUIS E. LORENZANA
600 B Street, Suite 1500
San Diego, CA 92101
Telephone:  619-233-4565
Facsimile:  619-233-0508
Email: ashingler@scott-scott.com
        mblasy@scott-scott.com
        llorenzana@scott-scott.com

SCOTT + SCOTT LLP
JOSEPH P. GUGLIELMO
29 West 57th Street, 14th Floor
New York, NY 10019
Telephone: 212-223-6444
Facsimile: 2012-223-6334
Email: jguglielmo@scott-scott.com

S/Héctor Eduardo Pedrosa Luna
Héctor Eduardo Pedrosa-Luna, Esq.
USDC-PR No. 223202
P O Box 9023963
San Juan, PR 00902-3963
Tel. 787-920-7983 Fax 787-764-7511
hectorpedrosa@gmail.com

***Attorneys for Plaintiff***

- 36 -

## VERIFICATION

I, Luis E. Miñana, hereby declare as follows:

1.       I am counsel for plaintiff in the above-entitled action.  I have read the foregoing Complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

1.       I make this Verification because plaintiff is absent from the County of San Juan, Puerto Rico where I maintain my office.

Executed this 5th day of June, 2009, at San Juan, Puerto Rico.


June 5th, 2009                           S/ LUIS E. MIÑANA
        Date                                    Luis E. Miñana